# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **ALEXANDRIA H. QUINN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:14-CV-1033-ALB-SMD** |
| | ) | |
| **CITY OF TUSKEGEE, ALABAMA,** | ) | |
| **and LEVY KELLY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Alexandria Quinn filed this civil rights action against the City of Tuskegee, Alabama (the "City"), and Levy Kelly, asserting claims under 42 U.S.C. § 1983 ("§ 1983") and Alabama state law arising out of an alleged statutory rape and use of excessive force by Kelly, a former police officer for the City of Tuskegee Police Department ("Tuskegee PD"). This matter comes before the Court on the City's Motion for Summary Judgment. (Doc. 92). For the reasons stated below, the motion is due to be granted in part and denied in part.

## BACKGROUND

Levy Kelly was hired as a City of Tuskegee police officer in 2005. Before Kelly was hired, the City performed a background check on Kelly, and Tuskegee Chief of Police Lester Patrick contacted the Hayneville police chief, Kelly's former supervisor, who told Chief Patrick that Kelly could be a "womanizer" and needed

supervision but would be a good police officer. In 2010, Kelly left the Tuskegee PD and rejoined the Hayneville Police Department ("Hayneville PD") as the Assistant Police Chief. But less than a year later in 2011, Kelly left the Hayneville PD and was again hired by the Tuskegee PD. The City performed another background check and the Hayneville police chief informed Chief Patrick that Kelly left the Hayneville PD because he had a "falling out" with the mayor.

As a Tuskegee police officer, Kelly was trained regarding the use of appropriate force, particularly the use of OC spray, or pepper spray. Kelly attended the police academy twice and was sprayed with OC spray each time as part of his training. In addition, Tuskegee police officers receive and are expected to follow the City's policy manuals regarding use of appropriate force.

I.    **Kelly's Sexual Relationships with Minors**

Alexandria Quinn met Kelly in November 2007 when she was 13 years old. Kelly began having a sexual relationship with Quinn shortly after she turned 14 years old. In fact, Kelly had sexual intercourse with Quinn at least fifteen times in between the time Quinn was 14 and 17 years old. On these occasions, Kelly was on duty as a police officer, used his police-issued Nextel phone to communicate with Plaintiff and to facilitate their sexual encounters, wore his police uniform with his gun, drove his patrol vehicle to meet Plaintiff, and often had sex with Plaintiff in his patrol vehicle. Quinn ended the relationship with Kelly in 2010.

Quinn alleges that the City was aware of Kelly's unlawful sexual relationship with her as a minor based on the following events:

- When she was a minor, Quinn called the Tuskegee PD at least ten times, asked to speak to Kelly, and told at least one dispatcher that she and Kelly were "in a relationship" (Doc. 92-1 at 4-5);

- Quinn went to Kelly's residence in 2009 when she was 16 years old and was told by Tuskegee police officer Wesley McClain that she needed to leave or would be arrested for trespassing, at which time Quinn told Officer McClain that she had been having sex with Kelly since she was 14 years old[1] (Doc. 92-1 at 5-6);

- Another Tuskegee police officer, Officer Washington, told Quinn that he knew she was having sex with Kelly but warned her to stay away from Kelly because Kelly was accusing her of stealing his motorcycle (Doc. 92-1 at 6-7);

- On one occasion, Quinn, who believed Kelly was following her, called the Tuskegee PD because she feared for her safety, and when the responding officers arrived, she told Officers Cheatham and Baker that Kelly had raped her when she was 14 years old (Doc. 92-1 at 8-9); and

---

[1] Officer McClain denies that Quinn informed him of any sexual relationship between Quinn and Kelly. (Doc. 92-4 at 3).

- Another police officer, Officer Clements, told Chief Patrick on two occasions in late 2007 that a teacher at Quinn's school contacted him, claiming that Kelly was "blatantly going with" and in a relationship with Quinn, a minor, but Chief Patrick "shrugged his shoulders" and did not investigate or take any action related to the allegations. (Doc. 92-5 at 6-8).

In addition, Officer Clements testified that there was at least one other complaint during this time period about Kelly having a sexual relationship with another minor, and that "[i]t was common knowledge among the members of the Tuskegee police force that Officer Kelly was having sex with young girls." (Doc. 98-2 at 5).

## II.   <u>Kelly's Termination</u>

In October 2012, Quinn was approached by Kelly in his patrol vehicle when she was standing outside her parked vehicle. Kelly approached Quinn from behind, sprayed her in the face with OC spray, handcuffed her, and placed her in his patrol vehicle. Kelly then opened a closed container of beer he retrieved from Quinn's car, poured it out nearby, called for backup, and arrested Quinn for minor in possession of alcohol. Two Tuskegee police officers responded to the scene, and Quinn told them that she and Kelly had been in a sexual relationship when she was 14 and that Kelly sprayed her with OC spray because he had a "grudge" against her. Kelly drove Quinn around in his patrol vehicle for approximately 15 minutes before taking her

to the police station. At the police station, Quinn was forced to stay in an interrogation room with Kelly for two hours before she was released.

After Quinn was released from custody, she filed a complaint with the Tuskegee PD related to her arrest and Kelly's use of OC spray. Chief Patrick and the Tuskegee PD's investigative division then launched an investigation into Quinn's complaint. Though the investigation was not concluded due to an unrelated incident involving Kelly, which is described below, the City claims that Chief Patrick did "not condone Kelly's use of OC spray, or lengthy interrogation of [Quinn], which was contradictory to the training Kelly received as an officer." (Doc. 92 at 6).

In October 2012, two weeks after Quinn's arrest, Kelly was involved in an off-duty shooting. Kelly was placed on administrative leave and an investigation was initiated by the Alabama Bureau of Investigation ("ABI"), which is now the Alabama Law Enforcement Agency. During ABI's investigation, ABI agents discovered photographs of multiple minors on Kelly's cellphone and questioned Quinn about her relationship with Kelly. Kelly was ultimately arrested and charged for having sexual relations with minors, and the minor in possession charge against Quinn was dismissed.

In November 2013, ABI informed the City that it was moving forward with the charges against Kelly, and at that time, Kelly was terminated.

Plaintiff filed this action against the City and Kelly on October 6, 2014. Shortly thereafter, this action was stayed pending the criminal proceedings against Kelly. The stay was lifted on December 10, 2018, and on June 19, 2019, Plaintiff filed her First Amended Complaint.

## STANDARD OF REVIEW

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013).

If the moving party meets its burden, the nonmoving party must then "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). But "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529

(11th Cir. 1996). The Court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

## DISCUSSION

Plaintiff asserts several claims against the City in her Amended Complaint: (1) § 1983 claims based on the City's alleged violations of her Fourth and Fourteenth Amendment rights; (2) state-law assault and battery claims; (3) state-law false arrest and/or false imprisonment claims; and (4) and state-law negligent and/or wanton hiring, training, and/or supervision claims. Plaintiff concedes in her response to the City's motion for summary judgment that the City is not liable for her assault and battery claims or her false arrest and/or false imprisonment claims. Thus, those claims against the City are due to be dismissed with prejudice, and Plaintiff's only remaining claims against the City are her § 1983 claims and her state-law claims for negligent and/or wanton hiring, training, and/or supervision.

## I.  § 1983 Claims

Plaintiff claims that the City is liable under § 1983 based on two theories: (1) Kelly's sexual relationship with—and statutory rape of—Plaintiff when she was a minor and/or (2) Kelly's arrest of and use of excessive force against Plaintiff in 2012.

A city cannot be held liable under § 1983 "solely because it employs a tortfeasor"—in this case, Kelly. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–

91 (1978). To hold the City liable under § 1983 for Kelly's actions, Plaintiff must show that the City had a policy or custom that was the "moving force" behind her alleged constitutional deprivations. *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997); *Young v. City of Augusta, Ga. Through DeVaney*, 59 F.2d 1160, 1170 (11th Cir. 1995) (requiring "a direct causal link" between the city's policy or custom and the alleged constitutional violations).

A policy is "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell*, 117 F.3d at 489. A custom is "a practice that is so settled and permanent that it takes on the force of law." *Id.* Such custom is "deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Young*, 59 F.3d at 1172 (quoting *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)). In limited circumstances, a city's failure to train or supervise its employees can "be properly thought of as a city 'policy or custom' that is actionable under § 1983" but only where the city's failure to train or supervise "in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *City of Canton v. Harris*, 489 U.S. 378, 387, 389 (1989); *Sewell*, 117 F.3d at 489-90.

A. § 1983 Liability for Kelly's Statutory Rape of Plaintiff

The City argues that it is not liable under § 1983 for Kelly's statutory rape of Plaintiff because (1) Kelly was not acting under color of state law and (2) the City did not have a policy or custom that caused the deprivation of Plaintiff's constitutional rights. The Court rejects these arguments.

First, the City claims that Kelly was not acting under state law when he statutorily raped Plaintiff because "he act[ed] only as a private individual" and "not in his official capacity or while exercising his responsibilities pursuant to state law." (Doc. 92 at 13). But the evidence in the record suggests the opposite.

"Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken under color of state law." *U.S. v. Picklo*, 190 F. App'x 887, 889 (11th Cir. 2006). Further, a police officer "may act under color of law even when engaging in an illegal activity." *Id.* at 888. In this case, Kelly used his police-issued Nextel phone to communicate with Plaintiff and to facilitate their sexual encounters; Kelly was on duty when he and Plaintiff met for sex; Kelly drove his patrol car and wore his police uniform to and from his sexual encounters with Plaintiff; and Kelly had sex with Plaintiff in his patrol car on multiple occasions. *Id.* at 889 (acknowledging that "being on duty, wearing a uniform, [and] driving a patrol car" are "outward indicia suggestive of state-authority"). In addition, Plaintiff testified that "by [Kelly] being in a police officer uniform with a gun, I felt at the age of 14 to believe that when a

police officer tell [sic] you to do something, that, you know, you're supposed to do it." (Doc. 98 at 7). Based on these facts, the Court concludes that Plaintiff has presented substantial evidence that Kelly used his authority as a police officer to engage in an unlawful sexual relationship with Plaintiff and thus was acting under color of state law. *See generally Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 480 (9th Cir. 1991) (finding that jury could have reasonably concluded from expert testimony that refugees were in "awe of government officials" and thus the defendant "used his government position to exert influence and physical control over these plaintiffs" to sexually assault them).

Second, the City argues that it has neither a policy nor custom that led to the alleged deprivation of Plaintiff's constitutional rights. As expected, the City does not have a written policy authorizing the statutory rape of minors by its police officers. But based on the record, Plaintiff has presented substantial evidence to create a genuine issue of material fact as to whether the City was deliberately indifferent to her rights.

Generally, "if the impropriety of an action 'is so obvious to all without training [or supervision],'" such as committing statutory rape, a city "may rely on the common sense of its [police officers] not to engage in . . . criminal conduct." *Doe ex rel. Doe v. City of Demopolis*, 461 F. App'x 915, 917 (11th Cir. 2012). But "a pattern

of known misconduct . . . may be sufficient to change reasonable reliance [on common sense] into deliberate indifference." *Id.*

Viewing the record in the light most favorable to Plaintiff, Plaintiff has presented evidence that the City was aware of Kelly's sexual misconduct with minors and failed to take any remedial action to stop it. First, the Hayneville police chief, Kelly's former supervisor, warned Chief Patrick that Kelly was a "womanizer" and needed supervision before Chief Patrick hired Kelly in 2005.[2] Second, according to Quinn, she or someone on her behalf told multiple Tuskegee police officers—specifically, Officers Clements, Washington, McClain, Baker, and Cheatham—that she had a sexual relationship with Kelly as a minor. For instance, on one occasion, Officer McClain was called to Kelly's house to remove Plaintiff from the premises, at which time Plaintiff claims she told Officer McClain that she and Kelly had been in a sexual relationship since she was 14 years old. Though Officer McClain denies that Plaintiff informed him of any sexual relationship, Officer McClain testified that he thinks he "went to [Chief Patrick] and told him about the situation with [Quinn] being removed from [Kelly's] house." (Doc. 92-4 at 6).

---

[2] Chief Patrick denies that the Hayneville police chief told him that Kelly was a "womanizer." (Doc. 92-2 at 7).

Perhaps most damning, Officer Clements testified that a teacher at Plaintiff's school contacted him one Saturday in late 2007 to ask about the police officer who was "blatantly going with this young girl here, Alex Quinn—Alexandria Quinn." (Doc. 92-5 at 6). After identifying Kelly as the officer, Clements claims that he immediately called Chief Patrick and told him about the teacher's allegations that Kelly was in a relationship with a minor. Chief Patrick told Officer Clements to check back with him on Monday, and when Officer Clements asked Chief Patrick on Monday what they were going to do about the allegations, Chief Patrick "shrugged his shoulders" and told him to "go to something else." (Doc. 92-5 at 8). Chief Patrick did not investigate the teacher's complaint and did not even question Kelly about the complaint or his relationship with Plaintiff. In other words, according to Officer Clements, Chief Patrick made a conscious choice to ignore the allegations made against Kelly. As a result, Kelly continued to have a sexual relationship with Plaintiff, a minor.

Officer Clements further testified that there were other complaints during this time period about Kelly's sexual misconduct, including at least one other complaint that Kelly was in a sexual relationship with another minor, and that "[i]t was common knowledge among the members of the Tuskegee police force that Officer Kelly was having sex with young girls." (Doc. 98-2 at 5).

And finally, after Kelly voluntarily left the Tuskegee PD in 2010 and reapplied in 2011, Chief Patrick rehired Kelly despite previous complaints about his involvement with underaged girls and despite Officer Clements's "emphatic[]" protests based on Kelly's prior issues with the department. (Doc. 92-5 at 10).

Considering the evidence in the record as a whole, there is a genuine issue of material fact regarding whether the City was deliberately indifferent to Plaintiff's rights, and thus the City's motion as to Plaintiff's § 1983 claim based on Kelly's statutory rape of Plaintiff is due to be denied.

B. § 1983 Liability for Kelly's Alleged Use of Excessive Force

The City concedes that Kelly was operating under color of law when he arrested Plaintiff in 2012. But the City argues that it cannot be held liable under § 1983 for Kelly's alleged use of excessive force because Plaintiff cannot show that it had a policy or custom that constituted deliberate indifference to her constitutional rights or that caused her constitutional injury. The Court disagrees.

To show the City's deliberate indifference, Plaintiff relies on one incident of excessive force used by a police officer—her 2012 arrest when Kelly sprayed OC spray in Plaintiff's face. A plaintiff can establish municipal liability based on a single violation of federal rights if it was "highly predictable" that a failure to supervise or train would result in the injury suffered and the failure to train or supervise represented the "moving force" behind the constitutional violation.

*Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005). This "single-incident liability" is based on "(1) the likelihood that a police officer will be confronted with a specific situation and (2) the predictability that an officer, when confronted with that situation, will violate a person's constitutional rights." *Davis v. City of Montgomery*, 220 F. Supp. 3d 1275, 1283-84 (M.D. Ala. 2016).

The City argues, correctly, that Plaintiff has introduced no evidence that it failed to train its police officers on the use of appropriate force. Rather, the undisputed evidence shows that Kelly received training on the use of appropriate force twice at the police academy and was even sprayed with OC spray as part of those trainings. The City's police officers, including Kelly, also receive and are expected to follow policy manuals outlining the use of appropriate force.

But Plaintiff does not argue that Kelly used excessive force during an ordinary interaction between a police officer and a citizen. Instead, Plaintiff's claim is that Kelly used his police car to seek her out because of their previous sexual relationship, assaulted her with pepper spray because of a grudge against her, and fabricated an excuse to arrest her so he could further intimidate her at the police station. That is, the alleged deliberate indifference was not the City's failure to train Kelly in how to use appropriate force, it was the City's decision to give Kelly the power of a police officer without appropriate supervision, even though it allegedly knew about Kelly's troubled relationship with Plaintiff. *See, e.g., Brown v. Bryan*

*Cnty.*, 219 F.3d 450, 463 (5th Cir. 2000) (affirming jury verdict based on single-incident liability for excessive force where an officer with a "personal record of recklessness and questionable judgment" was left "essentially, unsupervised"); *Sadrud-Din v. City of Chicago*, 883 F. Supp. 270, 276 (N.D. Ill. 1995) (denying summary judgment on § 1983 claim against city when police officer used his service weapon to shoot his estranged wife, who had previously complained to police officials about her husband without results).

Plaintiff specifically alleges that the City had notice that Kelly would use his power as a police officer to hurt her but did nothing to stop it. During her deposition, for example, Plaintiff testified that she called the police to report that Kelly was following her in a threatening manner:

> Kelly was following me. And I called Tuskegee Police Department, and I asked them to send a[n] officer out because I was in fear for my life. When the officer came out, it was Officer Cheatham. He came out to the call, and I told him that Kelly was following me and that I was in fear for my life. And he told the other officer that was with him, which was Coates -- Officer Coates, that I was just running off at the mouth, and he was the supervisor on duty and he needed to leave, that they was just going to leave -- they left me -- they left me behind McDonald's by myself.

(Doc. 92-1 at 8). Viewing the facts in the light most favorable to Plaintiff, there is a jury question as to the City's liability.

For these reasons, the City's motion as to Plaintiff's § 1983 claim based on Kelly's use of excessive force is due to be denied.

## II.    Negligent and/or Wanton Hiring, Training, and/or Supervision Claims

Unlike her federal law claims, Plaintiff's state-law claims fail. As an initial matter, the City argues that a city cannot be held liable for the wanton acts of its employees, and thus Plaintiff's wanton hiring, training, and/or supervision claims against the City fail. The Court agrees. Under Alabama law, a city's liability is limited to injuries suffered through "neglect, carelessness or unskillfulness." Ala. Code § 11-47-190 (1975); *Hilliard v. City of Huntsville*, 585 So. 2d 889 (Ala. 1991) (refusing to expand municipal liability to include wanton conduct). Thus, Plaintiff's claims for wanton hiring, training, and supervision are due to be dismissed with prejudice. *See Stephens v. City of Butler*, 509 F. Supp. 2d 1098, 1116 (S.D. Ala. 2007) (dismissing wanton supervision, hiring, and retention claims against city).

The City further argues that Plaintiff's negligent hiring, training, and/or supervision claims are also due to be dismissed because (1) her claims arguably do not exist under Alabama law, (2) the City is immune from such claims to the extent they exist, and (3) Plaintiff has failed to present substantial evidence of negligence to survive summary judgment. The Court need not address whether a claim against a municipality for its supervisor's negligent hiring, training, or supervision of an employee exists under Alabama law because even if it does, Plaintiff's claims still fail.

It is unclear from Plaintiff's brief whether she maintains her negligent training and supervision claims against the City. But to the extent she does, those claims must be based on the actions of Chief Patrick, the head of the Tuskegee PD. Indeed, as the City points out, Plaintiff alleges in her Amended Complaint that the City acted negligently "by and through Chief Lester Patrick." (Doc. 75, ¶ 61).

Under Alabama law, Chief Patrick—as a police officer employed by a municipality—is an "officer[] of [the] state, and as such [has] immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code § 6-5-338 (1975). Specifically, a state agent "shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as[] . . . hiring, firing, transferring, assigning, or supervising personnel." *Ex parte Butts*, 775 So. 2d 173, 177-78 (Ala. 2000). "It is well established that, if a municipal officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." *Ex parte City of Montgomery*, 99 So. 3d 282, 298 (Ala. 2012). Conversely, "if the statute does not shield the officer, it does not shield the city." *Ex parte City of Selma*, 249 So. 3d 494, 497 (Ala. 2017).

Here, Plaintiff alleges that Chief Patrick was negligent in training and supervising Kelly. The training and supervision of employees are discretionary functions covered by state-agent immunity. *Hughes v. City of Montgomery*, No. 2:12-cv-1007, 2013 WL 5945078, at *3 (M.D. Ala. Nov. 6, 2013). Because Chief Patrick is a peace officer, he is immune from suit based on negligence in his discretionary acts of training and supervising Kelly. And as a result, the City, too, is immune from suit.[3] *See id.* (concluding that state-agent immunity protected police chief and city from negligent hiring, training, and supervision claim). Thus, Plaintiff's negligent training and supervision claims against the City are due to be dismissed with prejudice.

Plaintiff also asserts a negligent hiring claim against the City. The parties dispute who the relevant decisionmaker is for purposes of this claim. The City argues that, though Tuskegee City Manager Al Davis has the "final say" in hiring decisions, it is nonetheless entitled to immunity because Chief Patrick committed the allegedly negligent actions at issue. But Plaintiff argues that Davis, who is not a peace officer entitled to state-agent immunity, made the decision to hire Kelly, and thus the City is not immune from Plaintiff's negligent hiring claim. Ultimately, this distinction

---

[3] Plaintiff appears to concede that the City is immune from suit based on Chief Patrick's alleged negligence in the supervision and training of Kelly as she offers no argument to the contrary in her response to the City's motion for summary judgment.

does not matter because even if Davis hired Kelly, Plaintiff's claim still cannot survive summary judgment.

To establish a negligent hiring claim, Plaintiff must show that Kelly "committed similar acts for a previous employer and that [the City] knew about these acts or should have discovered these acts in the exercise of due diligence." *Rhodes v. Arc of Madison Cnty., Inc.*, 920 F. Supp. 2d 1202, 1243 (N.D. Ala. 2013) (quoting *Jackson v. Cintas Corp.*, 391 F. Supp. 2d 1075, 1100 (M.D. Ala. 2005)). Further, Plaintiff must show that the City's incompetency was the "proximate cause of the alleged injury." *Johnson v. Brunswick Riverview Club, Inc.*, 39 So. 3d 132, 140 (Ala. 2009).

Based on Plaintiff's Complaint and her response to the City's motion, Plaintiff claims that the City's initial hiring of Kelly caused her statutory rape.[4] It is undisputed that Plaintiff ended her sexual relationship with Kelly in 2010 and that any statutory rape of Plaintiff by Kelly occurred before that time and before the City rehired Kelly in 2011. Thus, Plaintiff's claim is necessarily limited to what was known or should have been known by the City at the time of Kelly's initial hiring in 2005.

---

[4] Both the Complaint and Plaintiff's response to summary judgment focus on the first hiring, not the rehiring. Neither the operative Complaint nor Plaintiff's response argues that the City is liable for negligent hiring for the injuries Plaintiff suffered incident to her 2012 arrest.

Plaintiff has not presented substantial evidence that Davis or the City knew or should have known in 2005 that Kelly had engaged in sexual misconduct with minors in the past. In fact, there is no evidence in the record that Kelly had in fact engaged in sexual misconduct with minors before his employment as a Tuskegee police officer. At most, Plaintiff presented evidence that the Hayneville police chief, Kelly's former supervisor, described Kelly as a "womanizer" who needed supervision. But without more, this evidence is not enough to put the City on notice that Kelly would later engage in sexual misconduct *with minors*, *i.e.*, commit statutory rape.

Essentially, Plaintiff's protest is that the City should have done more before hiring Kelly in 2005. But even if the City had done more, Plaintiff has not identified any information in Kelly's background that would have put the City on notice as to Kelly's propensity to commit statutory rape. Though Plaintiff claims the City would have learned that Kelly had been twice fired from the Hayneville police department, there is no evidence in the record that Kelly was fired because of any illegal sexual relationship with a minor.

For these reasons, Plaintiff's negligent hiring claim against the City is also due to be dismissed with prejudice.

## CONCLUSION

Based on the foregoing reasons, the Court orders as follows:

1. The City's Motion for Summary Judgment (Doc. 92) is **GRANTED IN PART** and **DENIED IN PART**.

2. Plaintiff's assault and battery claims against the City (Counts II and III) are **DISMISSED WITH PREJUDICE**.

3. Plaintiff's false arrest and/or false imprisonment claims against the City (Count IV) are **DISMISSED WITH PREJUDICE**.

4. Plaintiff's Negligent and/or Wanton Hiring, Training, and/or Supervision claims against the City (Count V) are **DISMISSED WITH PREJUDICE**.

5. There is a genuine issue of material fact regarding the City's liability as to Plaintiff's § 1983 claim.

6. Plaintiff's claims against Defendant Levy Kelly remain pending.

**DONE** and **ORDERED** this 27th day of March 2020.

_____/s/ Andrew L. Brasher_____
ANDREW L. BRASHER
UNITED STATES DISTRICT JUDGE